**Opinion issued March 25, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-24-00743-CV**

———————————

**IN THE INTEREST OF D.S.D. JR., D.D. III, AND D.M.D., CHILDREN**

———————————————————————————————

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00007J**

———————————————————————————————

**MEMORANDUM OPINION**

In this accelerated appeal,[1] appellants, mother and father, challenge the trial court's order, entered after a bench trial, terminating their parental rights to their minor children, D.S.D. Jr. ("D.S.D."), D.D. III ("D.D."), and D.M.D. (collectively, the "children"), and awarding appellee, the Department of Family and Protective

---

[1] *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

Services ("DFPS"), sole managing conservatorship of the children. In their sole issue,[2] mother and father contend that the evidence is legally and factually

---

[2] Mother and father filed separate appellants' briefs, but both challenge the sufficiency of the evidence to support the trial court's finding that termination of mother's and father's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Further, we note that both mother and father, in their appellants' briefs, listed two "Issues Presented," with the first issue being whether the evidence is legally and factually sufficient to support the trial court's findings that mother and father knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being, engaged, or knowingly placed the children with persons who engaged, in conduct that endangered the children's physical or emotional well-being, and were convicted or placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under certain Texas Penal Code provisions. *See id.* § 161.001(b)(1)(D), (E), (L); *see also* TEX. R. APP. P. 38.1(f). Despite listing these sufficiency-of-the-evidence complaints in their "Issues Presented" section, mother and father, in the argument section of their appellants' briefs, state that they do not actually contest the trial court's finding, under Texas Family Code section 161.001(b)(1)(L), that they were convicted or placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(L); *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (only one predicate finding under Texas Family Code section 161.001(b)(1) is necessary to support termination of parental rights to child). Additionally, mother and father state, in their briefs, that they do not contest the trial court's findings, under Texas Family Code sections 161.001(b)(1)(D) and (E)—that they knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being and they engaged, or knowingly placed the children with persons who engaged, in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Because mother and father do not actually challenge the legal and factual sufficiency of the evidence related to the trial court's findings under Texas Family Code sections 161.001(b)(1)(D), (E), and (L), we treat their appellants' briefs as having raised a single issue. *Cf. In the Interest of A.B.-G.*, No. 01-24-00509-CV, 2024 WL 4982500, at *11–14 (Tex. App.—Houston [1st Dist.] Dec. 5, 2024, no pet.) (mem. op.) (explaining Texas Supreme Court "has never suggested that unchallenged child-endangerment findings must be reviewed for evidentiary sufficiency due to the collateral consequences associated with them"; instead, Texas Supreme Court "has only held that the courts of appeals must review

insufficient to support the trial court's finding that termination of their parental rights was in the best interest of the children.[3]

We affirm.

## Background

On January 3, 2023, DFPS filed a petition seeking termination of mother's and father's parental rights to the children and managing conservatorship of the children. At the time the trial court terminated mother's and father's parental rights to the children, D.S.D. was four years old, D.D. was almost three years old, and D.M.D. was two years old.

### Removal Affidavit

At trial, the trial court admitted into evidence a copy of the affidavit of DFPS investigator Jennifer McNulty. McNulty testified that on December 29, 2022, DFPS received a referral alleging physical abuse of D.Q.S.D., mother and father's infant son and the twin brother of D.M.D. The referral stated that emergency medical services ("EMS") had been called to mother and father's home at 9:38 a.m. on December 29, 2022. When EMS arrived, father was "doing compressions" on D.Q.S.D. Mother and father reported that D.Q.S.D. had been "swaddled and put in

---

child-endangerment findings when challenged"); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (stating court had previously held that due process required review of trial court's child-endangerment finding only when "parent challenge[d] that finding"); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

[3]  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

a playpen with [his] twin [sister]." About an hour later, mother and father found D.Q.S.D. "face down" in the playpen and not breathing. Mother and father called EMS. Upon arrival, EMS personnel "took over handling the situation" and transported D.Q.S.D. to the hospital, but the child could not be revived. At the time of his death, D.Q.S.D. was about five months old. Upon learning of D.Q.S.D.'s death, mother and father were "very emotional and upset." Neither parent appeared to be intoxicated while at the hospital, but father "smell[ed] strongly of marijuana."

As to D.Q.S.D., McNulty testified that he had "some injuries" at the time of his death. He had "little abrasions and non-healed lesions, including over [his] left and right temple and [his] right lower lip as well as several scratches over the base of [his] neck." (Internal quotations omitted.) D.Q.S.D. also had a "healed linear abrasion on [his] deltoid" and "[s]ome kind of . . . fingernail marks, though the actual cause [was] unknown." Further, D.Q.S.D. had sustained "blunt force trauma to the torso and internal and external injuries [that were] consistent with abuse."

The preliminary autopsy report for D.Q.S.D. stated that the child had sustained a "head trauma." D.Q.S.D. had "abrasions on [his] face," which could have been from the child's fingernails, but there were "a lot of them and weird scars on his chest." D.Q.S.D. also had "a healing laceration to [his] liver" and "200 milliliters of blood in [his] chest." And he had sustained "a fracture to the posterior

4

(back) six[th] (6th) rib that was more consistent with trauma than [with] cardiopulmonary resuscitation [("CPR")]."

According to McNulty, a special investigator spoke to mother and father about D.Q.S.D. on January 1, 2023. Both mother and father stated that they were unaware of any injuries to the child, and they could not explain the injuries found during D.Q.S.D.'s autopsy. Mother and father stated that D.Q.S.D. had not sustained any injuries in the seventy-two hours before his death, and the child had not been around any other family members without mother and father present.

### DFPS Caseworker Parker

DFPS caseworker Tyheshia Parker testified that DFPS became involved with the children after D.M.D.'s twin brother, D.Q.S.D., died in the care of mother and father. At the time the children entered DFPS's care, D.M.D. had a fractured arm and "some small abrasions." Mother and father did not give an explanation as to how D.M.D.'s arm was fractured. Mother and father also did not have an explanation for D.Q.S.D.'s injuries. Mother and father had stated that they were the children's only caregivers, yet they could not explain D.Q.S.D.'s death or injuries.

Parker further testified that at the time of trial, the children were living in a foster home together. They had been living with their foster parents for more than a year. The children were bonded with their foster parents. According to Parker, the children looked to their foster parents for safety and depended on them for

5

everything. They played with their foster parents and interacted well with them. The children's foster parents wanted to adopt them.

Parker also noted that the children's foster parents were committed to making sure that the children maintained ties to their heritage. At the daycare the children attended, the children had predominately black peers. The foster parents had also learned to appropriately do the children's hair, and Parker spoke to them about the importance of the children having connections to their culture to which the foster parents were receptive.

DFPS did not have any concerns about the children's safety in the foster home. The children had not had any incidents of broken bones while being cared for by the foster parents. The children's foster parents took the children to check ups and to the doctor if the children were feeling sick. Parker believed that the children's foster parents had made a positive improvement in the children's lives. The children appeared to have benefitted from the stability of their foster home, and Parker had observed improvements in the children's speech, behaviors, and emotional stability.

As to the children, Parker explained that D.M.D. was two years old and an active child. She participated in swimming and gymnastics, and she attended daycare. She liked to socialize with other children and enjoyed playing with her older brothers. D.M.D. did not have any special needs.

D.S.D. was four years old and doing well in the foster home. He was shy and when he first entered DFPS's care, he had "some behavior issues" in the home and at daycare. D.S.D.'s foster parents worked with D.S.D. on his behavior issues, and D.S.D. was no longer displaying those behaviors. Parker noted that D.S.D. was scared when she visited the foster home because he was worried about being taken out of the foster home. D.S.D. was in speech therapy because he was "still learning how to pronounce a lot of his words."

As to D.D., Parker testified that he was two years old and did not have any special needs. He was doing well in the foster home, and he was the most outgoing of the children. D.D. loved to "show off his toys." D.D. participated in swimming and gymnastics and enjoyed playing outside. D.D. had previously participated in speech therapy but had been successfully discharged.

Parker further testified that mother and father both received a family service plan ("FSP") in this case. Their FSPs required them to secure stable housing and stable income. Mother and father were also required to participate in random narcotics-use testing, a psychological evaluation, a domestic violence assessment, grief therapy, and parenting classes. And mother and father needed to refrain from engaging in criminal activity and to "sign a release of information." Father was required to participate in a psychiatric evaluation as well.

According to Parker, mother did not complete any of the requirements of her FSP. Father completed a psychological evaluation on April 21, 2023 and a domestic violence assessment. It was then recommended that father participate in anger management classes, individual counseling, grief counseling, parenting counseling, substance abuse counseling, and family counseling. Father had not completed those requirements.

Even though mother and father were incarcerated for a period of time while the case was pending, Parker visited both parents in jail three or four times. She informed mother that she could complete parenting classes and anger management classes while incarcerated, but mother did not do so.

In Parker's opinion, neither mother nor father had demonstrated an ability to provide a safe and stable environment for the children. Mother and father had not given Parker information as to where they were currently living, and Parker could not verify whether mother and father had stable housing. Mother and father had not asked to see the children since being released from incarceration, and they had not provided "any assistance or gifts for the[] children."

Parker was also concerned about the gnat infestation in mother and father's previous home where the children had been living before entering DFPS's care. And she noted that "[g]nats c[ould have] developed from a number of sources of things. It could [have been] uncleanliness. . . . It could also [have] be[en] that [mother and

8

father] did not address it or that there was an inability to rectify the concern." Additionally, Parker expressed concern that D.Q.S.D. and D.M.D. were sleeping, while in mother and father's care, without being monitored. And Parker was concerned that mother had only taken D.Q.S.D., who was four-and-a-half months old, to the doctor for one checkup since his birth.

Parker stated that DFPS was requesting that mother's and father's parental rights be terminated. She noted that both mother and father had pleaded guilty to the felony offense of injury to a child.[4] And she did not believe that mother and father had demonstrated any behaviors that would indicate it was safe to return the children to their care. Neither father nor mother had contacted Parker following their release from incarceration.

### Guardian Ad Litem Ramirez

Daisy Ramirez testified that she was the guardian ad litem assigned to the children's case. She recommended that the trial court award DFPS permanent managing conservatorship of the children, the children remain in their current placement, and mother's and father's parental rights be terminated.

Ramirez explained that she had visited the children at their foster home, and she did not have any concerns about the placement. The children's foster parents were meeting the children's physical and emotional needs. The children were very

---

[4]   *See* TEX. PENAL CODE ANN. § 22.04(a)(3), (f) (third-degree felony offense).

bonded with their foster parents and sought out their foster parents for comfort and reassurance.

As to mother and father, Ramirez expressed concern because they had pleaded guilty to the offense of injury to a child.[5] Ramirez was also concerned about the amount of injuries that D.Q.S.D. had sustained before his death. Ramirez believed that mother and father needed to attend parenting classes, domestic violence classes, individual therapy, trauma therapy, and family therapy to address their issues.

### Mother

Mother testified that she was the children's mother. At the time of trial, the children were all under three years old. Mother noted that she had another child, who was one year old,[6] but that child lived with his paternal grandmother. The paternal grandmother allowed mother to see the child, but the child did not stay with mother.

Mother stated that the children entered DFPS's care after their brother, D.Q.S.D., died on December 29, 2022. According to mother, D.Q.S.D., who was four and a half months old, had been placed in "his playpen with his twin [sister]," D.M.D., to sleep overnight. D.M.D. and D.Q.S.D. always shared a bed. When mother and father woke up the next morning, they found D.Q.S.D. face down in the

---

[5]     *See id.*

[6]     Mother had a total of five children.

playpen and deceased. They called for emergency assistance. EMS personnel came and took D.Q.S.D. to the hospital by ambulance, where he was pronounced dead. Mother did not know what caused D.Q.S.D.'s death, and D.Q.S.D.'s autopsy report "came back inconclusive." According to mother, the autopsy report did not list a cause of death.

After D.Q.S.D.'s death, the children were removed from mother's care because there were allegations of physical abuse committed by mother. Mother was also charged with the felony offense of injury to a child.[7] She was arrested on May 1, 2023 and incarcerated until July 19, 2024. Mother conceded at trial that she had been accused of "squeezing and striking" D.Q.S.D., but she stated that it was "not true." Mother pleaded guilty to a criminal offense, but she could not recall the offense that she pleaded guilty to. Mother did acknowledge that she had "pled guilty to hurting" D.Q.S.D., but she stated that she did not hurt D.Q.S.D. and that "[n]obody did." After mother pleaded guilty, the trial court deferred adjudication of her guilt and placed her on community supervision for a period of four years during which she was required to abide by certain terms and conditions. According to mother, she pleaded guilty so that she could get out of jail and "fight to get [her] kids back."

---

[7] *See* TEX. PENAL CODE ANN. § 22.04(a)(3), (f).

Mother also testified that she could not remember if she received an FSP from DFPS.[8] She recalled completing a psychological evaluation but stated that she was not asked to complete parenting classes because they were not offered while she was in jail. However, mother also testified that she was supposed to attend a parenting class "right before [she] got incarcerated." And mother stated that she was told that she could complete services while incarcerated, and she was given information about how to do so. Mother noted that she had not completed any of the required services, and she did not think that she needed services. Mother did not ask anyone about how to complete her required services while she was incarcerated.

Mother further testified that she participated in narcotics-use testing when requested, except for the most recent time because she did not have "a way to get there." The results of her narcotics-use testing were negative, and mother denied having a substance abuse problem.

Mother asked the trial court to return the children to her care. She explained that prior to his death, she and father were D.Q.S.D.'s primary caregivers because they "didn't trust people around [their] kids." Mother stayed at home with the children and D.Q.S.D., and father worked overnight. Father worked "different

---

[8]     At other times during her testimony, mother stated that she received an FSP in March 2023 before she was incarcerated on May 1, 2023.

jobs"; he worked at a Family Dollar store and a Jack in the Box restaurant. The family lived in a two-bedroom apartment at the time.

Mother had no explanation as to why D.Q.S.D. had sustained "multiple fractures" before his death, and mother did not notice any injuries on D.Q.S.D. before his death. She also had not noticed any injuries on the children while they were in her care.[9] Mother testified that D.Q.S.D. was premature when he was born and had "a lot of medical issues" following birth. According to mother, D.Q.S.D.'s oxygen levels were low at birth, and he needed a feeding tube while at the hospital. He stayed in the neonatal intensive care unit ("NICU") for a week and a half or two weeks. When D.Q.S.D. was discharged from the hospital following his birth, mother was told that he was "okay to go home."

Mother agreed that after D.Q.S.D.'s death, the medical examiner, during the autopsy, found that the child had "rib fractures," which were more than a week old. Mother did not have an explanation for those injuries, and again testified that only she and father were caring for D.Q.S.D. before his death. D.Q.S.D. also had fractures on his legs, which were "a couple weeks old." Mother acknowledged that she and father were responsible for knowing what had happened to D.Q.S.D.

---

[9] Mother stated that if D.M.D. had any bruises or marks on her when she entered DFPS's care, then her brother, D.S.D., could have caused them because he liked to play with his siblings. According to mother, D.M.D. did not have a broken arm when she entered DFPS's care.

13

As to father, mother stated that she and father were married. She also noted that father had another child, J.D., but his rights to that child had been terminated, and father had no contact with J.D. Father told mother that J.D.'s mother had been "doing drugs while she was breastfeeding" J.D. and that is why J.D. was taken away from father.

Mother further testified that she and father had lost their home while they were incarcerated, and she and father were living in a hotel room that the children's paternal grandmother was paying for. Mother did not know how long the paternal grandmother would be willing to pay for the room. Mother was not employed. If the children were returned to mother's and father's care, mother and father would need to get a hotel room with two beds. Mother would also get a job if the children were returned to her care. Mother noted that she did not work prior to having children.

Mother described herself as an "[o]kay mother." She noted that she had familial support in Houston from father's family. Mother had not had contact with the children since before she was incarcerated in May 2023.

***Father***

14

Father testified that he was the children's father. Father also had another child, who was six years old, but that child did not live with father; she lived with a family friend. Father was not sure if his parental rights to his six-year-old child had been terminated but stated that he had been involved with DFPS related to that child. Father also had a one-year-old child with mother who lived with father's mother, i.e., the children's paternal grandmother.

Father further testified that DFPS became involved with the children in this case because of D.Q.S.D.'s death on December 29, 2022. At the time, the children and D.Q.S.D. were living with mother and father. D.Q.S.D. was about four months old. Father was present when D.Q.S.D. was found unresponsive and not breathing. The child's face was purple. According to father, mother woke him up about 9:45 a.m. and "told [him] that [D.Q.S.D.] was not responding." D.Q.S.D. had been "face down" in his crib that he shared with his twin sister, D.M.D. D.M.D. was also in the crib at the time. Father told mother to call for emergency assistance, and he took D.Q.S.D. out of the crib and began administering CPR with D.Q.S.D. on the floor. Once EMS personnel arrived, the paramedics took over CPR. D.Q.S.D. was taken to a hospital by ambulance. When mother and father arrived at the hospital, they were told that D.Q.S.D. had died.

Following D.Q.S.D.'s death, father was charged with the felony offense of injury to a child,[10] and he was arrested on May 1, 2023. Father remained incarcerated until July 19, 2024. Father voluntarily pleaded guilty to the offense of injury to a child.[11] Father agreed that both D.Q.S.D. and D.M.D. had sustained injuries while in his care, but father stated that he pleaded guilty because he was "tired of sitting in jail" and he wanted to "try to start services again with [DFPS] to try to get [the children] back." Father also stated that he did not believe that anyone had hurt D.Q.S.D.

Father noted that he had seen the autopsy report for D.Q.S.D., and the medical examiner was unable to determine the cause of D.Q.S.D.'s death. As to any injuries D.Q.S.D. may have had at the time of his death, father could only attribute them to things that could have happened while CPR was being administered to D.Q.S.D. because father later found out that he did not perform CPR correctly. Father also stated that it was possible that D.S.D. had tried to play with D.Q.S.D., his younger brother, while mother and father were sleeping. But father had never seen D.S.D. hurt D.Q.S.D. before. Father did not know how D.Q.S.D. was injured.

---

[10]     *See* TEX. PENAL CODE ANN. § 22.04(a)(3), (f).

[11]     Father also testified that he had been previously convicted of giving "a false police report" in 2018.

Father further testified that mother was the main caregiver for the children and D.Q.S.D. before the children entered DFPS's care. Father worked eight-hour shifts, Monday through Friday, while mother stayed at home with the children and D.Q.S.D. Father worked at the Family Dollar store and was an assistant manager at a Jack in the Box restaurant. Father was home at night with the children and mother. On a typical evening, mother and father would let the children play with each other. The children took baths and were fed; they also watched cartoons and played with toys.

Father explained that the night before D.Q.S.D.'s death, D.Q.S.D. was acting normal. He was quiet, drank his bottles, and had regular bowel movements. He received a bath before mother put him to sleep in his crib with a bottle. D.Q.S.D. went to asleep around 9:00 p.m. or 10:00 p.m. the night before his death. It was unusual that D.Q.S.D. slept the entire night.

According to father, mother received minimal prenatal care while she was pregnant with D.Q.S.D. and D.M.D. D.Q.S.D. was born about six weeks prematurely, and he "went to the NICU" following birth. D.Q.S.D. was closely monitored in the hospital because he had a low birth weight. D.Q.S.D. spent about a week or two weeks in the NICU before he was discharged to go home. Father was not at the hospital when D.Q.S.D. was discharged; he was at home with the children. As to whether D.Q.S.D. was struggling with medical problems before his death,

17

father stated that doctors told him and mother that D.Q.S.D. was "doing fine." Father was not aware whether D.Q.S.D. had any medical conditions, but father did not have any concerns about D.Q.S.D. before his death.

Father stated that he wanted the children to be returned to his and mother's care. Father planned for the children "to become successful" and "to be healthy" and happy. Father wanted "another chance" "to be the best parent[]." If the children were returned to father's and mother's care, they "probably would go to a family friend or a family member." Father noted that he needed to find a job and "complete [his] classes," such as parenting classes and "things like that." Father also wanted to make sure that he was stable.

As to the terms of his community supervision, father testified that he needed to complete parenting classes and to not test positive for narcotics use. Father noted that while incarcerated he had refused to take a narcotics-use test because he was grieving and "had a lot on [his] mind." Father also testified that he refused to complete narcotics-use testing at the beginning of DFPS's involvement with the children because he "didn't trust that particular agency [that was] giving [him the] drug test at the time." As to his FSP, father explained that he received it in March 2023.

According to father, he had changed a lot during the pendency of the case, and he could "be the best parent[] [he] could be." Father stated that he had a support

system, and he was willing to take parenting classes. Father did not know if mother would get a job now that she was released from incarceration. Father explained that his and mother's current living situation was temporary, and he planned to get "stable housing and a stable job." Father was going to apply for jobs and was going "ask[] [his] pastor for extra help."[12] The children's paternal grandmother was currently paying for the hotel room where father and mother were staying.

Before entering DFPS's care, the children, according to father, were in a stable environment. The children were fed every day and had clothes. Father last saw the children in March 2023. Father noted that the apartment the children were living in before entering DFPS's care had a gnat infestation. He had tried to clean inside the playpens with Clorox because of the gnats. According to father, neither he nor mother ever "mishandled [the] children."

*Criminal History*

The trial court admitted into evidence a copy of an order of deferred adjudication related to mother, which was signed by the 228th District Court of Harris County, Texas on July 18, 2024, in trial court cause number 18175060. The order stated that mother pleaded guilty to the third-degree felony offense of injury

---

[12] Because trial in this case took place over a period of months, father subsequently testified that he got a job as a musician at his church, and he was being paid $350 every Sunday. Father and mother were still living in a hotel room.

to a child.[13]  The trial court deferred adjudication of mother's guilt and placed her on community supervision for a period of four years.  Attached to the order of deferred adjudication was a copy of the terms and conditions of mother's community supervision, which she was required to follow.[14]

Additionally, the trial court admitted into evidence a copy of mother's Waiver of Constitutional Rights, Agreement to Stipulate, and Judicial Confession and Admonishments signed by mother in trial court cause number 18175060.  In signing the documents, mother agreed that she was pleading guilty to a third-degree felony offense of injury to a child, and she affirmed that she was mentally competent, understood the nature of the charge against her, was making her plea freely, knowingly, and voluntarily, and had fully consulted with her attorney as to the consequences of her plea of guilty.  Mother also affirmed that she understood English and that she was confessing to committing the offense of injury to a child.

The trial court also admitted into evidence a copy of an order of deferred adjudication related to father, which was signed by the 228th District Court of Harris County, Texas on July 18, 2024, in trial court cause number 18175050.  The order stated that father had pleaded guilty to the third-degree felony offense of injury to a

---

[13]     *See id.*

[14]     The terms and conditions of mother's community supervision required mother to "[w]ork at suitable employment and/or attend school full-time."

child.[15]  The trial court deferred adjudication of father's guilt and placed him on community supervision for a period of four years.  Attached to the order of adjudication was a copy of the terms and conditions of father's community supervision, which he was required to follow.

Further, the trial court admitted into evidence a copy of father's Waiver of Constitutional Rights, Agreement to Stipulate, and Judicial Confession and Admonishments signed by father in trial court cause number 18175050.  In signing the documents, father agreed that he was pleading guilty to a third-degree felony offense of injury to a child, and he affirmed that he was mentally competent, understood the nature of the charge against him, was making his plea freely, knowingly, and voluntarily, and had fully consulted with his attorney as to the consequences of his plea of guilty.  Father also affirmed that he understood English and that he was confessing to committing the offense of injury to a child.

### *Narcotics-Use-Testing Results*

The trial court admitted into evidence copies of mother's and father's narcotics-use-testing results obtained during the pendency of the case.  On March 21, 2023, mother tested negative for narcotics use by urinalysis, but she tested positive for marijuana by hair-follicle testing.  On March 21, 2023, father refused to

---

[15]     *See id.*

21

be tested for narcotics use, and thus, he was considered to have a positive testing result.[16]

### *Foster Mother*

The children's foster mother testified that the children had been living with their foster parents for more than a year. Initially, when the children were placed in the foster home, D.S.D. and D.D. exhibited "symptoms of food insecurity or [of] having experienced food insecurity." The foster parents fed D.S.D. and D.D. five times a day. D.S.D. and D.D. would "frequently ask what the next meal was and what[] [was] it[] going to be." D.S.D. and D.D. would also overeat and would "be very anxious around mealtime about whether they were getting food."

Additionally, D.S.D., when he first came to his foster home, would have "frequent emotional outbursts where he would hit and scream and bite and throw himself to the floor and flip the table over." He would also pinch D.M.D.'s leg in the car to make her cry and "seemed to be sneaking about it, like he[] [did not] think [that the foster parents] were watching." D.S.D. would also hit D.M.D. if she was crying and say, "Dada said, shut up or Dada said, shut it." The foster parents put up

---

[16] *See In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (fact finder could infer parent's failure to submit to court-ordered narcotics-use testing indicated she was avoiding testing because she was using narcotics).

dividers in the car so that D.S.D. could not touch his sister, and monitored D.S.D. anytime he was playing with D.M.D.

According to the foster mother, D.S.D. did not exhibit those behaviors anymore; he had received play therapy while living with his foster parents to "address issues with hurting his sister . . . and for hitting other kids at school" and had graduated from play therapy. The play therapy discharge noted that D.S.D. was receiving the support that he needed from his foster parents.

The children's foster mother also explained that the children, at the beginning of living in the foster home, were anxious in new situations. They did not want to go play with other children at the park; they did not want to leave the foster parents' sides. The foster parents had to sit on the floor of the playroom for the children to want to play.

D.S.D. and D.D. also experienced night terrors for the first few months of living in the foster home. They would wake up a few times a night screaming. And the children were very distressed if their bedroom door was shut at nighttime.

As to the children at the time of trial, the foster mother testified that D.S.D. felt more secure in the foster home and that had led to less emotional outbursts. D.S.D. did not "usually hit his siblings anymore," and if he felt emotional, he would ask his foster parents for a hug instead. D.S.D. participated in speech therapy after

23

school, and he was being evaluated to receive it through his school district. D.S.D. was also receiving counseling services through his school district.

D.M.D. was potty-training and had moved into "a big girl's bed" in the foster home. The children shared a bedroom in the foster home and the extra bedroom in the home was a playroom for the children. According to the children's foster mother, the foster home was a safe and stable environment for the children. The children's foster parents liked to take them to museums, the zoo, and playgrounds.

If mother's and father's parental rights were terminated, the children's foster parents wanted to adopt them. The foster parents also planned on assisting the children in knowing their cultural heritage. The foster mother explained that it was important for the children to know about their adoption, and the foster parents had read books to the children and spoken to the children about their birth family and how they had younger siblings who they had not met. Further, the foster parents were committed to having people in the children's lives who looked like the children; the children's pediatrician, therapist, and teachers were the same ethnicity as the children. It was very important for the children to know "that they are black and that's their cultural history," even though their foster parents looked different from them.

### D.Q.S.D. Autopsy Results

The trial court admitted into evidence a copy of D.Q.S.D.'s autopsy report. The report listed D.Q.S.D.'s date of death as December 29, 2022, but it listed the cause of death and manner of death as "[u]ndetermined."

The autopsy report described D.Q.S.D. as a four-month old child. It also stated that he appeared well-nourished, and his size was comparable to other children his age.

As to D.Q.S.D.'s injuries, the autopsy report stated that D.Q.S.D. had abrasions on his face and neck. He had "[a]cute fractures of multiple right ribs," which were "consistent with compression." D.Q.S.D. also had "[o]lder fractures on multiple left ribs," which were "consistent with compression." These older fractures were estimated to be "weeks old" at the time of D.Q.S.D.'s death. Further, D.Q.S.D. had "[f]ractures of [his] left radius, left ulna, femurs[,] and left tibia," which were "consistent with shearing, torsion, or tensile forces" being applied to D.Q.S.D.'s body and estimated to be "weeks old" at the time of D.Q.S.D.'s death. And D.Q.S.D. had "[h]ypopigmented scars [on his] left shoulder and anterior and posterior torso."

The autopsy report also explained that "an asphyxial mechanism of death (e.g., smothering) c[ould not] be excluded" as the manner of death. And although the "acute right-side rib fractures . . . may [have been] consistent with bystander [CPR] attempted by a caregiver," the "older fractures of [D.Q.S.D.'s] left ribs, left radius, left ulna, femurs, and left tibia" had "no explanation." The left rib fractures

25

were "consistent with at least one traumatic event involving compression of the inferior chest occurring a minimum of weeks prior to [D.Q.S.D.'s] death."

In summation, the autopsy report stated that the fractures on D.Q.S.D.'s "ribs, left distal radius and ulna, bilateral distal femora, and left proximal tibia" were "consistent with at least two traumatic events, one occurring at or around the time of [D.Q.S.D.'s] death and one occurring a minimum of weeks prior to death." "The event occurring a minimum of weeks prior to [D.Q.S.D.'s] death [was] represented by the left rib fracturs and the fractures of the left distal radius and ulna, bilateral distal femora, proximal left tibia, and possibly the right distal radius and ulna." The location of the left rib fractures was consistent with a compression of the inferior chest occurring. The other fractures were "consistent with the application of shearing, torsion, and[] tensile forces to [D.Q.S.D.'s] left wrist, bilateral lower extremities, and possibly the right wrist."

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of his children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [his] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530

26

U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof.

27

*Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a

28

reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Sufficiency of Evidence

In their sole issue, mother and father argue that the trial court erred in terminating their parental rights to the children because the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in the best interest of the children.[17] *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the children. *See id.* Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact. *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531,

---

[17] Mother and father are represented by different attorneys and have filed separate appellants' brief. But both mother and father challenge the sufficiency of the evidence support the trial court's best-interest finding. Given the nature of the evidence, we will consider their issues together. *See, e.g.*, *N.A.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-14-00377-CV, 2014 WL 6845179, at *1 n.1 (Tex. App.—Austin Nov. 26, 2014, no pet.) (mem. op.); *see also* TEX. R. APP. P. 47.1.

533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Here, mother and father have not challenged the sufficiency of the evidence supporting the trial court's findings, under Texas Family Code section 161.001(b)(1), that they that they knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being, they engaged, or knowingly placed the children with persons who engaged, in conduct that endangered the children's physical or emotional well-being, and they were convicted or placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (L). Thus, our focus is on the sufficiency of the evidence supporting the trial court's finding that termination of mother's and father's parental rights was in the best interest of the children. *See id.* § 161.001(b)(2).

The best-interest analysis evaluates the best interest of the children. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent

placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parents. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's and father's parental rights was in the best interest of the children, we may consider several factors, including: (1) the desires of the children; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parents' acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parents' acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018);

31

*In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no

32

writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children because the children were "too young to express their desires," DFPS failed to establish that mother was not capable of meeting the children's physical and emotional needs, the children did not have any special needs, mother and father denied harming their children, DFPS did not present any evidence that mother lacked parental abilities, mother and father wanted the children "back in their home," father had regained employment, and neither mother nor father were charged with a criminal offense related to D.M.D.'s broken arm.

Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of the children because the children were "too young to express their desires," mother and father did not have access to the children to establish a bond while they were incarcerated, DFPS failed to prove that father was not meeting the children's physical and emotional needs, father was not responsible for D.Q.S.D.'s injuries or the children's injuries, father only pleaded guilty to the felony offense of injury to a child so that he could be released from jail, the family's home life was stable before

D.Q.S.D.'s death, the children did not have any special needs, and father was in the process of securing appropriate housing for the family.

### 1. Children's Desires

When mother's and father's parental rights were terminated, D.S.D. was four years old, D.D. was almost three years old, and D.M.D. was two years old. As such, they could not directly express a desire as to whether they wished to be placed in mother's and father's care or remain in the care of their foster parents.

When there is no specific evidence of a children's desires and the children are too young to express those desires, a fact finder may consider evidence that the children are bonded with their foster family and receive good care in their current placement. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2023, pet. denied) (mem. op.). In their briefing, mother and father do not contest that the children's current placement with their foster parents is stable and that the children are doing well in their foster home. They also acknowledge that the foster parents are meeting the children's needs. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering evidence children doing well in placement with foster parents, who were meeting children's needs); *In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex.

34

App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires).

DFPS caseworker Parker testified that the children had been living in their foster home for more than a year, and they were bonded with their foster parents. The children looked to their foster parents for safety and depended on them for everything. They played with their foster parents and interacted well with them.

Guardian ad litem Ramirez similarly testified that she had visited the children at their foster home, and they were bonded with their foster parents. The children sought out their foster parents for comfort and reassurance.

The children's foster mother testified that the foster parents wanted to adopt the children. The children's bond with their foster family implies that the children's desires would be fulfilled by adoption by the foster family. *See In re T.C.C.H.*, No. 07-11-00179-CV, 2011 WL 6757409, at *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.). Further, both parents conceded at trial that they had not seen the children in more than a year, which given the children's ages was a significant portion of their lives. *See In re M.T.*, No. 14-22-00198-CV, 2022 WL 3204819, at *9 (Tex. App.—Houston [14th Dist.] Aug. 9, 2022, no pet.) (mem. op.) ("When a child is too young to express his desires, the fact finder may consider that the child has bonded with his current placement, is well cared for by them, and has spent minimal time with a parent.").

### 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

#### a. *Safe and Stable Home*

The children's need for a safe and stable home is the paramount consideration in assessing the best interest of the children. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re L.W.*, 2019 WL 1523124, at *18; *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment). Here, there is no evidence in the record that mother and father can provide the children with a safe and stable home. See *In re L.W.*, 2019 WL 1523124, at *18; *Adams*, 236 S.W.3d at 280 (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest).

While the children lived with mother and father, D.M.D. and her twin brother, D.Q.S.D., shared a playpen, and on at least one occasion, they were sleeping without being monitored by mother and father. D.Q.S.D. was found by mother and father face down in the playpen and deceased next to D.M.D. D.Q.S.D.'s face was purple.

The children were present in the home while father was performing CPR on D.Q.S.D. and when EMS personnel arrived to transport D.Q.S.D. to the hospital. Additionally, D.M.D., after being removed from mother's and father's care, entered DFPS's care with a broken arm. *See In re L.W.*, 2019 WL 1523124, at *19 ("[A] parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child.").

The record also contains evidence that the children, before entering DFPS's care, lived in an apartment with mother and father that had a gnat infestation. Father had attempted to get rid of the gnat infestation by using Clorox on the children's playpen but was unsuccessful.

As to their current living situation, mother and father testified that they were living in a hotel room that was being paid for by the children's paternal grandmother. Mother, however, testified that they would need a different hotel room if the children were returned to her and father's care because their current room only had one bed. DFPS caseworker Parker stated that neither mother nor father had provided her with information as to where they were living, and she was unable to verify whether mother and father had stable housing.

Tellingly, father stated that if the children were returned to mother's and father's care, they "probably would go to a family friend or a family member." Although father indicated that he had recently become employed as a musician at

37

his church,[18] father conceded that his and mother's living situation at the time of trial was temporary and he had not yet obtained "stable housing."  *See In re M.T.*, 2022 WL 3204819, at \*10 (where evidence did not suggest that parent could provide stable home, holding evidence sufficient to support trial court's best-interest finding); *In re M.A.A.*, 2021 WL 1134308, at \*22 (noting record contained no evidence that parent was "able to provide the children with a safe and stable home"); *In re P.S.*, No. 02-16-00458-CV, 2017 WL 1173845, at \*9 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.) (explaining although parent testified that she would be able to provide safe and stable housing for children in future, she had not demonstrated ability to provide stable environment for children).

In contrast, mother and father, in their briefing, acknowledge that the children's foster parents were "meeting all of the children's needs."  And DFPS caseworker Parker testified that she did not have any concerns about the safety and stability of the children's foster home.  The children had not had any incidents of broken bones while being cared for in the foster home, and the children's foster parents took them to check ups and to the doctor if they were feeling sick.  According to Parker, the children had benefitted from the stability that their foster home

---

[18]    A parent's recent improvement in his potential ability to provide a safe and stable home for the children is generally not sufficient to avoid termination of parental rights.  *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at \*30 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.).

provided. The children's foster mother also testified that her home was a safe and stable environment for the children, and the foster parents wanted to adopt the children. *See In re H.D.J.A.*, No. 04-24-00515-CV, 2024 WL 5195300, at *6 (Tex. App.—San Antonio Dec. 23, 2024, no pet.) (mem. op.) (holding evidence sufficient to support trial court's best-interest finding where evidence showed child placed in safe foster home that was meeting his physical and emotional needs).

### b.    *Endangerment and Criminal Conduct*

The children's exposure to violence in the home undermines the safety of the home environment and is relevant when considering the best interest of the children. *See In re L.W.*, 2019 WL 1523124, at *19; *In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.). Further, "it [is] a form of abuse for the children [to be] exposed to an environment where physical abuse occurred even if it was not directed toward them." *In re O.N.H.*, 401 S.W.3d 681, 685 (Tex. App.—San Antonio 2013, no pet.). Evidence of a parent's past misconduct can be used to measure a parent's future conduct. *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *Banargent v. Brent*, No. 14-05-00574-CV, 2006 WL 462268, at *2 (Tex. App.—Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem. op); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.)

39

("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

Both mother and father testified that while the children were in their care, they were the children's and D.Q.S.D.'s primary caregivers because they "didn't trust people around [their] kids." Mother stayed at home with the children during the day, while father worked. Father stated that he was home at night with the children, D.Q.S.D., and mother. DFPS caseworker Parker testified that although mother and father reported that they were the children's and D.Q.S.D.'s only caregivers, neither mother nor father had an explanation for the cause of D.Q.S.D.'s death or his injuries—many of which were weeks old.

A copy of D.Q.S.D.'s autopsy report was admitted into evidence at trial. Although it listed D.Q.S.D.'s cause of death and manner of death as "[u]ndetermined," it stated that D.Q.S.D. had abrasions on his face and neck.[19] He had "[o]lder fractures on multiple left ribs," which were also "consistent with compression" These older fractures were estimated to be "weeks old" at the time of

---

[19] DFPS investigator McNulty testified in her affidavit that D.Q.S.D. had "some injuries" at the time of his death, including "little abrasions and non-healed lesions . . .over [his] left and right temple and [his] right lower lip as well as several scratches over the base of [his] neck." Additionally, D.Q.S.D. had a "healed linear abrasion on [his] deltoid" and "[s]ome kind of . . . fingernail marks, though the actual cause [was] unknown" as well as "weird scars on his chest."

D.Q.S.D.'s death and were "consistent with at least one traumatic event involving compression of the inferior chest."

Further, D.Q.S.D. had "[f]ractures of [his] left radius, left ulna, femurs[,] and left tibia," which were "consistent with shearing, torsion, or tensile forces" being applied to D.Q.S.D.'s body and estimated to be "weeks old" at the time of D.Q.S.D.'s death. And D.Q.S.D. had "[h]ypopigmented scars [on his] left shoulder and anterior and posterior torso." According to the autopsy report, "an asphyxial mechanism of death (e.g., smothering) c[ould not] be excluded" as the manner of death for D.Q.S.D. Neither mother nor father had any explanation as to the cause of D.Q.S.D.'s death or "weeks old" injuries, yet mother and father both acknowledged that they were both the only caregivers for D.Q.S.D. prior to his death *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *In re H.L.F.*, No. 12-11-00243-CV, 2012 WL 5993726, at *7 (Tex. App.—Tyler Nov. 30, 2012, pet. denied) (mem. op.) (conduct toward other children relevant consideration in best-interest analysis); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) (evidence of how parent treated another child is relevant).

Additionally, DFPS caseworker Parker testified that, at the time D.M.D. entered DFPS's care, she, an infant, had a broken arm and "some abrasions." Mother stated that if D.M.D. had any bruises on marks on her when she entered DFPS's care, then her brother, D.S.D., could have caused them because he liked to pay with his siblings. Mother denied that D.M.D. ever had a broken arm. *See In re L.W.*, 2019 WL 1523124, at *19 ("[A] parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child."); *In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) ("[The] past is [a] prologue[;] there is a great likelihood that [a parent's] conduct w[ill] continue into the future. Actions speak louder than words."); *see also In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a [caregiver] who is unable or unwilling to protect them or attend to their needs because they have no ability to protect themselves."); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.) (parent's poor judgment may be considered in determining child's best interest).

We also note that a parent's criminal history is relevant in analyzing the present and future emotional and physical danger to the children and whether a parent can provide a safe and stable home for the children. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *18–

42

19 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest). "As a general rule, conduct that subjects the children to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child[ren]." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Here, mother and father testified that they were charged with the felony offense of injury to a child and were arrested and incarcerated. They spent most of the time this case was pending incarcerated.[20] *See In re M. F.*, No. 07-18-00126-CV, 2018 WL 4039429, at *3 (Tex. App.—Amarillo Aug. 23, 2018, no pet.) (mem. op.) (in determining whether sufficient evidence supported trial court's finding that termination of parental rights in child's best interest, considering that parent had been incarcerated for most of case).

The trial court admitted into evidence a copy of orders of deferred adjudication related to mother and father, which were signed by the 228th District Court of Harris County, on July 18, 2024, in trial court cause numbers 18175060

---

[20] Mother and father were incarcerated from May 1, 2023 to July 19, 2024. This constituted a significant portion of their children's lives. *See, e.g., In re L.L.M.*, No. 04-13-00351-CV, 2013 WL 5950151, at *4 (Tex. App.—San Antonio Nov. 6, 2013, no pet.) (mem. op.) (considering parent had been incarcerated during parental-termination proceedings and large portion of children's lives).

and 18175050.  The orders showed that mother and father each pleaded guilty to the third-degree felony offense of injury to a child related to D.Q.S.D.  *See* TEX. PENAL CODE ANN. § 22.04(a)(3), (f).  The trial court deferred adjudication of mother's and father's guilt and placed both parents on community supervision for a period of four years.  At the time of trial, mother and father were on community supervision and were required to abide by the terms and conditions of their community supervision.  Notably, one of the terms and conditions of mother's community supervision required her to "[w]ork at suitable employment," and mother testified at trial that that she was unemployed, and father stated that he did not know if mother intended to get a job now that she was released from incarceration.  *See In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *13 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.) (explaining parent's violation of terms of her community supervision constituted endangering conduct and exposed her to likelihood of incarceration).

As to the charges against mother and father, the trial court admitted into evidence a copy of a document titled, Waiver of Constitutional Rights, Agreement to Stipulate, and Judicial Confession, which was signed by mother and stated:

> [O]n or about December 29, 2022, [mother] did then and there unlawfully, intentionally and knowingly cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by twisting and pulling [D.Q.S.D.] with [mother's] hand.

44

. . . [O]n or about December 29, 2022, [mother] did then and there unlawfully, intentionally and knowingly cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by squeezing [D.Q.S.D.] with [mother's] hand.

. . . [O]n or about December 29, 2022, [mother] did then and there unlawfully, intentionally and knowingly cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by striking [D.Q.S.D.] with [mother's] hand.

. . . [O]n or about December 29, 2022, [mother] did then and there unlawfully, while having a statutory duty to act pursuant to [s]ection 151.001 of the Texas Family Code, intentionally and knowingly by omission cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by failing to protect [D.Q.S.D.].

*See* TEX. PENAL CODE ANN. § 22.04(a)(3). Similarly, the trial court admitted into evidence a copy of a document titled, Waiver of Constitutional Rights, Agreement to Stipulate, and Judicial Confession, which was signed by father, and stated:

[O]n or about December 29, 2022, [father] did then and there unlawfully, intentionally and knowingly cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by pulling and twisting [D.Q.S.D.] with [father's] hand.

. . . [O]n or about December 29, 2022, [father] did then and there unlawfully, intentionally and knowingly cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by squeezing [D.Q.S.D.] with [father's] hand.

. . . [O]n or about December 29, 2022, [father] did then and there unlawfully, intentionally and knowingly cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by striking [D.Q.S.D.] with [father's] hand.

. . . [O]n or about December 29, 2022, [father] did then and there unlawfully, while having a statutory duty to act pursuant to [s]ection 151.001 of the Texas Family Code, intentionally and knowingly by

45

omission cause . . . bodily injury to [D.Q.S.D.,] . . . a child younger than fifteen years of age, by failing to protect [D.Q.S.D.].

*See id.*; *see also In re A.K.T.*, 2018 WL 6423381, at \*12, \*16 (considering evidence of parent's history of engaging in violent and abusive conduct in analyzing current and future emotional danger to child; parent's lack of self-control and propensity for violence may be considered as evidence of endangerment); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (in termination-of-parental-rights cases, evidence parent engaged in abusive conduct in past permits inference parent will continue behavior in future)

In connection with their pleas of guilty, mother and father both signed documents affirming that they were mentally competent, understood the nature of the charges against them, were making their pleas freely, knowingly, and voluntarily, and had fully consulted with their attorneys as to the consequences of their pleas of guilty. Mother and father also affirmed that they understood English and that they were confessing to committing the criminal offense of injury to a child. *See In re E.J.*, Nos. 14-23-00387-CV, 14-23-00399-CV, 2023 WL 8043686, at \*9 (Tex. App.—Houston [14th Dist.] Nov. 21, 2023, no pet.) (mem. op.) (inappropriate, abusive, or unlawful conduct by parent can create environment that endangers physical and emotional well-being of children); *see also In re L.R.D.*, No. 01-23-00623-CV, 2024 WL 560668, at \*15, \*19 (Tex. App.—Houston [1st Dist.] Feb. 13, 2024, no pet.) (mem. op.) (considering, in best-interest and endangerment

analysis, that parent was charged with offense of injury to child and placed on community supervision for that offense); *see also In re H.L.F.*, 2012 WL 5993726, at *7 (conduct toward other children relevant consideration in best-interest analysis); *Jordan*, 325 S.W.3d at 724 (same). Although mother and father, at trial, denied hurting D.Q.S.D. and stated that they pleaded guilty so that they could get out of jail, the trial court was entitled to disbelieve their testimony. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (holding fact finder had "full opportunity to observe witness testimony first-hand" and was "the sole arbiter when assessing credibility and demeanor of witnesses"); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (trial court, as fact finder, was sole judge of credibility of witnesses and weight to be given their testimony).

### 3. Parental Abilities, Plans for Child, Stability of Proposed Placement, and Availability of Assistance[21]

#### a. *Mother and Father*

DFPS caseworker Parker testified that the children entered DFPS's care after D.M.D.'s twin brother, D.Q.S.D., died in the care of mother and father. Mother and father had no explanation for D.Q.S.D.'s death or the injuries found during his

---

[21] Much of the evidence discussed above is also relevant to mother's and father's parental abilities, their plans for the children, and the stability of the proposed placements for the children. *See* TEX. R. APP. P. 47.1.

autopsy—many of which were weeks old.[22] Mother and father stated that they were the children's and D.Q.S.D.'s only caregivers.

Mother and father testified that D.Q.S.D., at four-and-a-half months old, was placed in "his playpen with his twin [sister]," D.M.D., to sleep overnight. When mother and father woke up the next morning, they found D.Q.S.D. face down in the playpen deceased. His face was purple. Mother and father both pleaded guilty to the felony offense of injury to a child related to the injuries D.Q.S.D. sustained. *See, e.g.*, *In re J.N.*, No. 10-16-00234-CV, 2017 WL 730364, at *8 (Tex. App.—Waco Feb. 22, 2017, no pet.) (mem. op.) ("In determining that [parent] has poor parenting abilities, trial court could have considered the evidence that [parent] was the primary caregiver of the children and that [parent] caused [the children's] injuries while they were in his care.").

Additionally, when the children entered DFPS's care, it was discovered that D.M.D. had a broken arm, yet mother testified that she had not noticed any injuries to the children while they were in her care. Mother stated that if D.M.D. had any bruises or marks on her when she entered DFPS's care, then her brother, D.S.D., must have caused them. *See In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a parent who is unable or unwilling

---

[22] The injuries to D.Q.S.D. are discussed above. *See infra*.

to protect them or attend to their needs because they have no ability to protect themselves."). Mother denied that D.M.D. ever had a broken arm.

Before the children entered DFPS's care, mother and father lived in a two-bedroom apartment with them and D.Q.S.D. That apartment was suffering from a gnat infestation that mother and father had not been able to fix. Mother and father no longer lived in that apartment, but at the time of trial, they were living in a hotel room that was being paid for by the children's paternal grandmother. Mother did not know how long the paternal grandmother would continue paying for the room, and mother stated that it would not be appropriate for the children to live there because there was only one bed.

Both mother and father testified that they wanted the children returned to their care, but father testified that if the children were returned, they "probably would go to a family friend or a family member." Father acknowledged that his life was not stable at the time of trial. *See In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest."). And both mother and father testified that they were on community supervision related to their guilty pleas.

Father had recently obtained employment at his church, but at the time of trial, mother was not employed—a violation of the terms of her community supervision. Father did not know if mother would get a job now that she was released from incarceration. Neither father nor mother had taken parenting classes during the pendency of the case.

### b. *Current Placement*

DFPS caseworker Parker testified that the children were living in a foster home together, and they had been living with their foster parents for more than a year. The children were bonded with their foster parents, and according to Parker, the children looked to their foster parents for safety and depended on them for everything. *See In re S.H.*, No. 01-22-0255-CV, 2022 WL 17254956, at *14 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) ("[A] child's bond with his placement family implies that the child's desires would be fulfilled by adoption by the placement family."); *In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 4, 2022, no pet.) (mem. op.) (in holding sufficient evidence to support trial court's finding termination of parental rights in children's best interest, considering evidence showed that children were thriving in current placement, placement was meeting all the children's needs, and children were bonded with foster family).

They played with their foster parents and interacted well with them. According to Parker, the children's foster parents wanted to adopt them, and the foster parents were committed to making sure that the children maintained ties to their cultural identities. *See In re J.M.*, 156 S.W.3d 696, 708 (Tex. App.—Dallas 2005, no pet.) (holding evidence sufficient to support trial court's finding termination of parental rights in child's best interest where "[t]he evidence show[ed] the foster parents' home [was] stable").

Parker also stated that DFPS had no concerns about the children's safety in their foster home. The children had not had any incidents of broken bones while being care for by their foster parents, and the foster parents took the children to check ups and to the doctor if the children were feeling sick. Parker believed that the children's foster parents had made a positive improvement in the children's lives, and Parker had observed improvements in the children's speech, behaviors, and emotional stability while the children were in their foster parents' care.

While living with their foster parents, the children participated in different activities. D.M.D., who was two years old, participated in swimming and gymnastics; she also attended daycare where she liked to socialize with other children. D.D., who was two years old, also participated in swimming and gymnastics, and he enjoyed playing outside. D.D. previously participated in speech

51

therapy while living with his foster parents, but he had been successfully discharged from it.

As to D.S.D., who was four years old, Parker testified that when he first entered DFPS's care, he had "some behavioral issues" in the foster home and at daycare. But the foster parents had worked with D.S.D. on his behavior issues, and D.S.D. was no longer displaying those behaviors. D.S.D. was in speech therapy because he was "still learning how to pronounce a lot of his words."

Guardian ad litem Ramirez similarly testified that the children were doing well in their foster home, and the foster parents were meeting the children's physical and emotional needs. The children were very bonded with their foster parents and sought out their foster parents for comfort and reassurance.

Additionally, the children's foster mother testified that the children had been living with their foster parents for more than a year. Initially, when the children were placed in the foster home, D.S.D. and D.D. exhibited "symptoms of food insecurity or [of] having experienced food insecurity." The foster parents fed D.S.D. and D.D. five times a day. D.S.D. and D.D. would "frequently ask what the next meal was and what[] [was] it[] going to be." D.S.D. and D.D. would also overeat and would "be very anxious around mealtime about whether they were getting food."

Further, when D.S.D. first came to live with his foster parents, he would have "frequent emotional outbursts where he would hit and scream and bite and throw

himself to the floor and flip the table over." He would also pinch D.M.D.'s leg in the car to make her cry and "seemed to be sneaking about it, like he[] [did not] think [that the foster parents] were watching." D.S.D. would also hit D.M.D. if she was crying and say, "Dada said, shut up or Dada said, shut it." The foster parents put up dividers in the car so that D.S.D. could not touch his sister, and they monitored D.S.D. anytime he was playing with D.M.D.

Notably, the foster mother testified that D.S.D. no longer exhibited such behaviors. He had received play therapy while living with his foster parents to "address issues with hurting his sister . . . and for hitting other kids at school" and had graduated from play therapy. The play therapy discharge noted that D.S.D. was receiving the support that he needed from his foster parents.

The children's foster mother also explained that the children, at the beginning of living in the foster home, were anxious in new situations. They did not want to go play with other children at the park; they did not want to leave the foster parents' sides. The foster parents needed to sit on the floor of the playroom for the children to want to play. Additionally, D.S.D. and D.D. experienced night terrors for the first few months of living in the foster home. They would wake up a few times a night screaming. And the children were very distressed if their bedroom door was shut at nighttime.

As to the children at the time of trial, the foster mother testified that D.S.D. felt more secure in the foster home and that had led to less emotional outbursts. D.S.D. did not "usually hit his siblings anymore," and if he felt emotional, he would ask his foster parents for a hug instead. D.S.D. participated in speech therapy after school, and he was being evaluated to receive speech therapy through his school district. D.S.D. was also receiving counseling services through his school district. *See J.D.S. v. Tex. Dep't of Fam. & Protective Servs.*, 458 S.W.3d 33, 44–45 (Tex. App.—El Paso 2014, no pet.) (noting, in holding evidence was sufficient to support trial court's finding termination of parental rights in child's best interest, that child was thriving in placement and child was improving while in placement).

D.M.D. was potty-training and had moved into "a big girl's bed" in the foster home. The children shared a bedroom in the foster home and the extra bedroom in the home was a playroom for the children. According to the children's foster mother, the foster home was a safe and stable environment for the children. The children's foster parents liked to take them to museums, the zoo, and playgrounds. *See In re P.G.D.*, No. 04-19-00896-CV, 2020 WL 2543310, at *5 (Tex. App.—San Antonio May 20, 2020, pet. denied) (mem. op.) (considering children were in loving foster home that was meeting their needs and children were making developmental progress).

The foster mother testified that if mother's and father's parental rights were terminated, the children's foster parents wanted to adopt them. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them); *see also In re J.D.*, 436 S.W.3d at 118 ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest."). The foster parents planned on assisting the children in knowing their cultural heritage. The foster mother explained that it was important for the children to know about their adoption, and the foster parents had read books to the children and spoken to the children about their birth family and how they had younger siblings who they had not met. Further, the foster parents were committed to having people in the children's lives who looked like the children; the children's pediatrician, therapist, and teachers were the same ethnicity as the children. It was very important for the children to know "that they are black and that's their cultural history," even though their foster parents looked different than them.

## 4.     Acts and Omissions of the Parents

A parent's failure to comply with his FSP supports a finding that termination of his parental rights is in the best interest of the children. *See In re J.S.B.*, 2017 WL 6520437, at *22; *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

DFPS caseworker Parker testified that mother and father both received FSPs in this case.[23]  Their FSPs required them to secure stable housing and stable income. Mother and father were also to participate in random narcotics-use testing, a psychological evaluation, a domestic violence assessment, grief therapy, and parenting classes.  Mother and father needed to refrain from engaging in criminal activity and to "sign a release of information."  Father was required to participate in a psychiatric evaluation as well.  According to Parker, mother did not complete any of the requirements of her FSP.  Father completed a psychological evaluation on April 21, 2023 and a domestic violence assessment.  It was then recommended that father participate in anger management classes, individual counseling, grief counseling, parenting counseling, substance abuse counseling, and family counseling.  Father had not completed those requirements.  *See In re M.L.H.*, No. 04-21-00408-CV, 2022 WL 526501, at *4 (Tex. App.—San Antonio Feb. 23, 2022,

---

[23]     Although mother, initially during her testimony, could not recall if she had received an FSP, she later testified that she received an FSP in March 2023 before she was incarcerated on May 1, 2023.

pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding where parent "engaged in her service plan, [but] failed to successfully complete it"); *In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.) (fact finder could infer from parent's failure to take initiative to complete services required to regain possession of her children that parent did not have ability to motivate herself to seek out available resources needed now or in future); *cf. In re N.J.H.*, 575 S.W.3d at 835 (whether parent complied with FSP proper consideration in best-interest analysis and parent's compliance with FSP weighed in parent's favor and against termination)

Parker testified that she visited mother and father while they were incarcerated three or four times, and she informed mother that she could complete her parenting classes while incarcerated, but mother did not do so. After being released from incarceration, mother and father had not given Parker any information about where they were living, so Parker could not verify if they had stable housing.

Mother testified that she had not completed any of the requirements of her FSP, other than a psychological evaluation. Mother acknowledged that she was supposed to attend parenting classes as required by her FSP, but she had not done so

before she was incarcerated, during her incarceration, or after she was released.[24]

Mother stated that she did not think she needed to complete the requirements of her FSP. *See In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("[Parent's] failure to complete the court-ordered service plan demonstrate[d] that she [was] unwilling to take advantage of the services offered to her by [DFPS] and cast[ed] doubt on her parenting abilities.").

Mother also conceded that at the time of trial, she and father were living in a hotel room that the children's paternal grandmother was paying for. Mother did not know how long the paternal grandmother would be willing to pay for the room, and mother had not gotten a job after being released from incarceration.

Father testified that he needed to complete parenting classes and to not test positive for narcotics use. Father noted that while incarcerated, he had refused to take a narcotics-use test, and he also stated that he refused to participate in

---

[24] Mother, at times during her testimony, seemed to dispute that she was asked to take parenting classes and that such classes were available to take while she was incarcerated. "In a bench trial, the trial [court] is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' credibility." *In re E.F.K.*, No. 01-24-00120-CV, 2024 WL 3417138, at *6 (Tex. App.—Houston [1st Dist.] July 16, 2024, no pet.) (mem. op.); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (holding fact finder had "full opportunity to observe witness testimony first-hand" and was "the sole arbiter when assessing credibility and demeanor of witnesses"); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (trial court as fact finder was sole judge of credibility of witnesses and weight to be given their testimony). As fact finder, the trial court was entitled to believe one witness and disbelieve another with respect to disputed facts, and an appellate court must defer to the fact finder's resolution of such disputes. *In re C.E.*, 687 S.W.3d 304, 314 (Tex. 2024)

narcotics-use testing at the beginning of DFPS's involvement with the children because he "didn't trust that particular agency [that was] giving [him the] drug test at the time."

Father also conceded that he did not have a stable environment for the children to be returned to, and if the children were placed in his and mother's care, they "probably would go to a family friend or a family member." *See In re I.L.G.*, 531 S.W.3d at 356.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's and father's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's and father's parental rights was in the best interest of the children. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's and father's parental rights was in the children's best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's and father's parental rights was in the best interest of the children. *See id.*

We overrule mother's and father's sole issue.

## Conclusion

We affirm the order of the trial court.


Clint Morgan
Justice

Panel consists of Justices Guerra, Caughey, and Morgan.